*446
 
 Gabrielli, J.
 

 The primary question raised by these cross appeals in these so-called inequality proceedings brought under article 7 of the Real Property Tax Law concerns the kind of proof which can properly form the basis for determination of the ratio of assessed value to fair market value as provided under subdivision 3 of section 720 of the Real Property Tax Law. The years in question are 1964 through 1970.
 
 [1]
 

 There is a two-step process in proving an inequality case. The petitioner must prove a proper ratio of assessed value to fair market value, and then he must establish the fair market value of his property. Proof on these two points then leads to the application of a simple arithmetic process whereby ratio times market value equals proper assessed valuation.
 

 Subdivision 3 of section 720 of the Real Property Tax Law limits the methods by which ratio may be proved. ' ‘ 3. Evidence on the issue of whether an assessment is unequal shall be limited as hereinafter provided. The parties shall mutually agree on the parcels to be appraised and the number of witnesses to be heard with respect to such issue. In the event the parties fail tti agree on such parcels or on the number of witnesses, upon application of either party the court or referee shall select the parcels to be appraised without reference to their assessed values, or shall determine the number of witnesses, or both, as the case may be. Before any testimony is given by either party as to the value of such parcels, each party shall simultaneously file with the court or referee, on a date fixed by the court or referee, a written statement or tabulation of the appraised values placed upon such parcels by the witnesses of the respective parties, and each party shall serve on the other at the same time a copy of such statement or tabulation of values stated by his witness. The parties shall be limited in their proof on the trial of such issues to such parcels and witnesses, except that in any event, whether or not parcels are selected as hereinabove provided, evidence may be given by either party as to (1) actual
 
 *447
 
 sales of real property within the assessing unit that occurred during the year in which the assessment under review was made and (2) the state equalization rate established for the roll containing the assessment under review.”
 

 Here petitioner submitted the three kinds of proof permitted by the statute, (1) selected parcels, (2) actual sales, and (3) the equalization rate. Ten selected parcels were utilized by the court and the appraisal evidence bearing on those properties varies markedly, each side, of course, having submitted properties displaying ratios in its favor. The sales for each side were likewise selected so as to result in the ratios most favorable to each side. Respecting the third item of proof, the equalization rate, petitioner put on witnesses who explained in detail the statistical method by which the rates were arrived at, and, in support of this, computer printouts were introduced showing the data collected and how it bore on the ultimate selection of a particular equalization rate.
 

 The trial court, impressed with the statistical backing given the equalization rate, and the fact that it was the only really objective ratio evidence in the case, based his findings solely on those rates for all the years in question. The Appellate Division modified, holding that the equalization rate could provide the sole basis only for 1970; and that it could only be used as some evidence for the preceding years. The case was not remanded, however, the Appellate Division proceeding to make its own findings from all the evidence as to those previous years. The result was that the findings of overassessment were cut somewhat.
 
 [2]
 
 It was held that because of certain statutory amendments and' case law over the course of the preceding 20 years, it was not until 1970 that the equalization rate could be used as the sole basis; that prior to that it could be considered as some evidence, but was not entitled to much weight.
 

 That history, briefly, is this: In
 
 People ex rel. Yaras
 
 v.
 
 Kinnaw
 
 (303 N. Y. 224), involving a claimed inequality for the year 1948, this court per then Judge Ftjld held that the State equal
 
 *448
 
 ization rate was completely inadmissible. This was chiefly because the purpose sought to be achieved through such a device was to ascertain whether the valuations in one tax district bear a just relation to the valuations in all tax districts, and the equalization rate would tend toward such a just relation. There was never any claim that the rates had anything to do with individual properties. Judge Fuld noted that a bill introduced in the Legislature in 1950 which would have made a county equalization rate “ presumptive evidence ” of the ratio of inequality was vetoed, the Governor pointing out that the county equalization rate bears no accurate relationship to the true full value of the property in the county (303 N. Y., at p. 231).
 

 Meanwhile, in 1949 the Legislature created a temporary commission known as the State Board of Equalization and Assessment to review and revise equalization rates and to hear appeals from the fixing of rates by the various county boards of supervisors and other local authorities (L. 1949, ch. 346). The board was reconstituted as a permanent agency in 1960 (L. 1960, ch. 335; Real Property Tax Law, §§ 200-216;
 
 Matter of Town of Smithtown
 
 v.
 
 Moore,
 
 11 N Y 2d 238, 241). The first set of rates appear to have been established by the board in 1954 and hav^ continued annually ever since, now into the computer age. Prior to this, rates were promulgated locally, their primary use being for apportionment of taxes in joint districts. “ Since the state had no significant interest in equalization rates, little effort was expended on their establishment. It was well known during this period that the state rates were not based on scientific studies and that they were substantially out of date ” (Koeppel, Inequality In Real Property Tax Review, 19 Buffalo L. Rev. 565, 568-569 [1969-1970]). It is easily seen, then, why this court refused to allow in the rate in the
 
 Yaras
 
 case.
 

 In 1961 the Legislature amended subdivision 3 of section 720 of the Beal Property Tax Law so that the selected parcels’ yardstick was still the chief item of proof, but provided that, additionally, proof of actual sales and the State equalization rate could come in (L. 1961, ch. 942). In 1969 this court held in
 
 Matter of O’Brien
 
 v.
 
 Assessor
 
 (20 N Y 2d 587) that although the 1961 amendment rendered the equalization rate admissible, it did not purport to authorize such proof independently of the other requirements in subdivision 3 of section 72Q; that the rate
 
 *449
 
 should not be applied automatically and would be entitled to little weight. Noting the statement in
 
 Bucho Holding Co.
 
 v.
 
 Temporary State Housing Rent Comm.
 
 (11 N Y 2d 469, 472, n. 2) that the State rate “ does not purport to measure the ratio of assessed valuation to full value of any individual property ”, Judge Bergan wrote (20 N Y 2d, at p. 596):
 

 “ One difficulty with an uncritical judicial acceptance of an equalization rate is that it is arrived at as an administration decision by the State. Board of Equalization and Assessment * * * which is not judicially reviewable at all by the taxpayer and which is reviewable by the tax district under the limitations of article 78 of the CPLR, i.e., whether sustained by substantial evidence before the board * * *
 

 “
 
 One party could thus find himself bound by an administrative determination in which he had not participated and which he could not review; and the other by a determination where the review was markedly narrower in scope than the plenary factual inquiry available in the trial of the tax review proceeding itself.”
 

 On the heels of that decision subdivision 3 was again amended and now reads as set forth at the beginning of this opinion (L. 1969, ch. 302). The significance of the amendment, of course, is that the phrase “ whether or not parcels are selected as hereinabove provided ” was inserted, thus, according to the analysis by the court below (41 A D 2d, at p. 482), making it ‘ ‘ too obvious for dispute that the statute permits parties to an inequality proceeding to rely solely on evidence of contemporaneous sales or the State equalization rate. They are no longer required to submit proof of the value of select parcels (see 19 Buffalo L. Rev., 565, 568-569) ”. The Appellate Division then summarily held that the ratio for 1970 could be based squarely on the equalization rate.
 

 Our chief concern is whether that analysis of the 1969 amendment is correct. We find that it is and that it provides a solution to a situation fraught with problems over the years. As we see in this case the selected parcel and actual sales methods not only create discouraging and enormous expense for the taxpayer, but promote the search by both sides for samples which are at the extreme ends of the spectrum — the same egregious
 
 *450
 
 problem we seem always to find in expert valuation testimony in condemnation cases. Utilization of the equalization rate which is objectively arrived at, and which today is expertly arrived at, would tend to greatly simplify and narrow the scope of these proceedings.
 

 Application of the equalization rate as the sole basis for ratio for the year 1970 is easily justified in this case. First, the intent of the 1969 amendment rather clearly was to overrule the holding in
 
 O’Brien.
 
 The memorandum in suppport of the measure submitted by the State Board of Equalization and Assessment (N. T. Legis. Annual, 1969, p. 439) emphasizes that the equalization rates today reflect more accurately the ratio of assessed value to full value than the ratio produced by either the actual sales or selected parcels methods. “ ‘ This is so because the state rates are based upon larger appraisal samples than those presented to the court under present law. Also state rates are based upon samples of representative classes while the parcels in a parcels proceeding are not intended to be representative. ’ ”
 
 {Ibid.)
 

 Second, the argument advanced in the Nassau County
 
 amicus
 
 brief that such a construction would be unconstitutional because, as Judge Bebgait pointed out in
 
 O’Brien,
 
 the rate would be used against parties (among which could be Nassau County) who have no standing to challenge it when it is promulgated by the administrative agency, assumes too much. It assumes that the equalization rate would be automatically applied in all cases. Unless stipulated to, such would not be the case at all. The party who seeks to use the rate will be put to his proof that such use is justified in that case. So, in the instant case, petitioner produced Samuel J. Stein, Director of Research and Statistics for the State Board of Equalization and Assessment as a witness. He interpreted the computer printouts showing data making up the rate formulation, explained how it was collected and showed that it pertained specifically to the taxing unit in issue. Nowhere does the city or Nassau County argue that this evidence, which was fully open to impeachment attempts, w;as not relevant or probative. And although they argue that the equalization rate is not established for this purpose, overlooked is the fact that the Legislature specifically made it applicable
 
 *451
 
 in 1961 and reinforced this applicability in 1969, and the additional fact that while the primary purpose of the State equalization rate may be to facilitate uniform State aid to localities, there is no discernible reason why it also may not be used in individual inequality cases. Of course, the taxing authority will always be entitled to show that the equalization ratio is inappropriate to the taxing unit, to the category of property involved and to the particular property or any other valid reason which would affect its relevancy or weight. The same questions then arise as would respecting any sort of proof; its weight and application are subject to judicial decision which can be reviewed on appeal.
 

 In this case the city errs when it says that the Trial Justice “ disregarded ” the other evidence. He regarded it, but then rejected it in light of the far more probative evidence supporting the equalization rate. Of course, the Appellate Division was correct in ruling that for the years 1964-1969 the rate could not alone be used under the controlling
 
 O’Brien
 
 decision but for the years 1970 forward the method utilized by the Trial Justice, considering the evidence before him, was fully justified.
 

 The city attempts to avoid statistical evidence backing up the equalization rate by arguing that the computer printouts could not come in under the business entry rule (CPLR 4518) and that they are not the best evidence. Essentially, the business entry exception to the hearsay rule is based on the concept of routineness. The routineness of the entry in the usual course of business tends to guarantee truthfulness because of the absence of motivation to falsify. Certainly, compiling and feeding data into a computer in the context we have before us would seem to be as routine a function as could be imagined and should be included under CPLR 4518. This is the result reached by one writer (Comment, Computer Print-Outs of Business Records And Their Admissibility In New York, 31 Albany L. Rev. 61, 73). And while there seems to be no reported New York case thus far on this point, we note that the proposed subdivision (6) of rule 803 of the Federal Rules of Evidence, the business entry rule, includes
 
 “
 
 data compilation ”, explained by the draftsmen as meaning the electronic computer storing of information other than conventional words and figures in documen
 
 *452
 
 tary form (Advisory Committee’s Note, U. S. Code Serv., Special Issue, Jan. 1973, p. 102). Nowhere in the present case, moreover, did the city challenge the routineness of this data storage. As for the best evidence rule, the “ voluminous writings ” exception to that rule would apply. That permits the admission of summaries of voluminous records or entries where, if requested, the party against whom it is offered can have access to the original data. (See Richardson, Evidence [10th ed.], § 574.) There seems to have been no claim here that the city was denied access to the underlying material.
 

 Other points raised by the city are likewise meritless. Joined with the main appeal is another appeal by the city complaining of the costs, fees and expenses assessed against it. Section 716 of the Real Property Tax Law provides that in an inequality proceeding the petitioner may request the municipality to stipulate the applicable ratio, and that if such demand is rejected and if petitioner proves the correct ratio to be not in excess of the one for which stipulation was sought, he may be awarded reasonable expenses incurred in making his proof
 
 ‘
 

 [1]
 

 irrespective of the results of the proceeding.”
 

 The city’s supplemental brief addressed to this point shows that, indeed, the final ratios decided upon by the Appellate Division, except for the year 1966, were below those to which petitioner sought the city’s stipulation. The main reason the city kept the appeal from the judgment awarding costs alive is that, in the event we should reverse or modify on the main appeal, the penalty provisions of section 716 might not apply. Other arguments are factual and
 
 de minimus
 
 in light of the trial court’s memorandum in support of the award and the Appellate Division’s affirmance with which we agree.
 

 The orders appealed from should be affirmed.
 

 Chief Judge Breitel and Judges Jasen, Jones, Wachtler, Rabin and Stevens concur.
 

 Orders affirmed, with costs to petitioner.
 

 [1]
 

 . The property is located at 323 South Salina Street in downtown Syracuse, the heart of the business district, and consists of 3,316 square feet of land with 25.12 feet of frontage and 132 feet in depth. The building, about 70 years old, occupies the entire land area and is five stories in height used solely as petitioner’s hobby shop and toy store. Petitioner purchased the property in 1955 for $295,000.
 

 [2]
 

 . The Appellate Division’s ratios exceeded those arrived at by the trial court by only a percentage point or two for most of the years in question, and the Appellate Division also found a somewhat higher market value for those years, all of which placed the resulting assessed valuations above those found by the trial court, but still well below those contended for by the city.