860 EXECUTIVE TOWERS, INC., Respondent, v BOARD OF ASSESSORS OF THE COUNTY OF NASSAU, Appellant. (And 19 Other Captioned Proceedings.)

860 EXECUTIVE TOWERS, INC., Respondent, v BOARD OF ASSESSORS OF THE COUNTY OF NASSAU, Appellant. (And 14 Other Captioned Proceedings.)

MAJESTIC DEVELOPMENT CORP., Respondent, v BOARD OF ASSESSORS OF THE COUNTY OF NASSAU, Appellant. (And 14 Other Captioned Proceedings.)

960 BROADWAY Co. et al., Respondents, v BOARD OF ASSESSORS OF THE COUNTY OF NASSAU, Appellant. (And 22 Other Captioned Proceedings.)

In the Matter of CERRO CORPORATION, Respondent, v BOARD OF ASSESSORS et al., Appellants.

Second Department, July 12, 1976

*James M. Catterson, Jr. (Leon Friedman* of counsel), County Attorney *(Kaye, Scholer, Fierman; Hays & Handler [Milton Kunen, Stanley H. Fuld, Sidney Kwestel* and *Vincent J. Syracuse],* Special Counsel), for appellants.

*Koeppel Sommer Lesnick & Martone, P. C. (Adolph Koeppel, William D. Siegel, Irving I. Lesnick, Bernard Sommer* and *Saul R. Fenchel* of counsel), for respondents in the first, second, third and fourth above-captioned proceedings.

*Santemma, Costigan & Murphy (George B. Costigan, Jr.* and *Abraham Brinn* of counsel), for Cerro Corporation, respondent.

HOPKINS, Acting P. J. In *Guth Realty v Gingold* (34 NY2d 440), decided in June, 1974, it was held, upon an analysis of the 1969 amendment to subdivision 3 of section 720 of the Real Property Tax Law, that the State equalization rate may be utilized as the sole basis for determining ratio in tax certiorari proceedings for the years 1970 forward. All of the within appeals by the appellant Board of Assessors (the County) are basically premised upon the County's contention that the *Guth* decision is limited to its own facts and does not foreclose it from challenging the methodology and underlying data employed by the State Board of Equalization and Assessment (SBEA) in promulgating the State equalization rates and, further, that utilization of the State rates as the sole basis for determining ratio in Nassau County is totally unjustified. As a practical matter, acceptance of the County's arguments would undermine the basic holding in *Guth.* This we decline to do.

The first above-captioned proceeding (860) actually encompassed 20 separate certiorari proceedings, covering the years

1966 through 1973, which were consolidated for purposes of a joint trial on the issue of ratio. That is, the petitioners were challenging their real property assessments on grounds of inequality—claiming that the assessments of the subject properties had been made at a higher proportionate valuation or ratio than the assessments of other real property on the same tax roll. For example, a specific claim might be that a subject property was assessed at 35% of its full value while other properties on the roll were assessed at only 30% of full value. If true, the petitioning taxpayer would be paying more than his due share of the aggregate tax.

Although inequality can be shown, theoretically, only by establishing that the subject property has a higher rate of assessment than *all* other properties in the taxing district, the Legislature has, over the years, prescribed various procedures to shorten trials in inequality cases. Until 1969, the use of the selected parcel method was mandatory under subdivision 3 of section 720 of the Real Property Tax Law, with taxpayers having the additional option of introducing evidence of the State equalization rate and actual sales of real property. The selected-parcel method requires the parties to mutually agree upon a selection of "sample" parcels. Failing such agreement, the court is to select the parcels. Each side must then employ expert appraisers to determine the market value of such sample parcels, with the court being the final arbiter of such value. The rate of assessment or ratio would be found by dividing the aggregate sums of the assessed value of all sample parcels by the aggregate sums of their market value.

The State equalization rate has a varied history. Prior to 1949 the rate was of very limited use, since only small amounts of State aid were apportioned on the basis thereof, and local taxing and borrowing powers were based upon the *assessed valuation* of taxable real property. Moreover, since the State had no significant interest in equalization rates, little effort was expended upon their establishment. They were not scientifically developed; they were substantially out of date; and they did not even purport to reflect the ratio of assessed value to market value within the tax district. Rather, aiming only for a just apportionment of taxes in joint taxing districts, the State equalization rate was intended to measure merely the value of taxable property within each district *(People ex rel. Yaras v Kinnaw,* 303 NY 224; Koeppel, Ine-

quality In Real Property Tax Review, 19 Buffalo L Rev 565, 568-569).

In 1949 the State Constitution was amended so as to relate local taxing and borrowing powers to the average full valuation of taxable real estate, which was defined as constituting the *ratio of the assessed valuations of taxable real estate to the full valuations* thereof for the last completed assessment roll and the four preceding rolls (art VIII, § 10). At the same time, the Legislature created a temporary commission, known as the State Board of Equalization and Assessment, with the power, *inter alia,* to review and revise State equalization rates. It was during that period that the practice of periodic statistical surveys was begun. In 1960 the SBEA was reconstituted as a permanant agency and, pursuant to article 12 of the Real Property Tax Law, it was required to sample the ratio of assessments to market values for each major type of taxable real property at least once in every five years, and to ascertain, as nearly as it could, the percentage of full value at which taxable real property was assessed.

In 1961 the Legislature amended subdivision 3 of section 720 of the Real Property Tax Law to allow the parties in an inequality proceeding to introduce in evidence the State equalization rate established for the roll containing the assessment under review. In 1967 the Court of Appeals held that the amended statute did not eliminate, but rather continued, the requirement that the parties employ the selected-parcel method of proving inequality; and that the State rate was entitled to "little weight" and could not, standing alone, sustain a claim of inequality *(Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587, 596). The court observed (pp 596-597) that the State rates served an entirely different function from the establishment of inequality in litigation between a property owner and a tax district; the State rates were arrived at by processes quite foreign to those employed in juridical determinations, since, for example, the SBEA may, in establishing rates pursuant to subdivision 2 of section 1202 of the Real Property Tax Law, "avail itself of all information appearing in its office"; and the State rates are arrived at as an administrative decision, which is not reviewable at all by the taxpayer and reviewable by the taxing district only under the limited scope of an article 78 proceeding.

In 1969 the Legislature again amended subdivision 3 of section 720 to overcome the holding in *O'Brien.* This time, it

expressly provided that the State equalization rates could be admitted in evidence whether or not the selected-parcel method was employed; and an accompanying legislative memorandum emphasized that eliminating the necessity of undergoing a selected-parcel proceeding would particularly benefit the owners of small properties by lessening the expense of proving inequality. Judicial approval for the use of the State rate as the sole determinant of ratio came in 1974 in *Guth Realty v Gingold* (34 NY2d 440, *supra),* where both the appellant and respondent 860 Executive Towers, Inc. appeared *amicus curiae.*

As it refers specifically to the appellant's *amicus* brief, we quote at length from the opinion in *Guth,* written by Judge GABRIELLI for a unanimous court, as follows (pp 449-451):

"Our chief concern is whether that analysis of the 1969 amendment is correct. We find that it is and that it provides a solution to a situation fraught with problems over the years. As we see in this case the selected parcel and actual sales methods not only create discouraging and enormous expense for the taxpayer, but promote the search by both sides for samples which are at the extreme ends of the spectrum—the same egregious problem we seem always to find in expert valuation testimony in condemnation cases. Utilization of the equalization rate which is objectively arrived at, and which today is expertly arrived at, would tend to greatly simplify and narrow the scope of these proceedings.

"Application of the equalization rate as the sole basis for ratio for the year 1970 is easily justified in this case. First, the intent of the 1969 amendment rather clearly was to overrule the holding in *O'Brien.* The memorandum in support of the measure submitted by the State Board of Equalization and Assessment (N.Y. Legis. Annual, 1969, p. 439) emphasizes that the equalization rates today reflect more accurately the ratio of assessed value to full value than the ratio produced by either the actual sales of selected parcels methods. ' "This is so because the state rates are based upon larger appraisal samples than those presented to the court under present law. Also state rates are based upon samples of representative classes while the parcels in a parcels proceeding are not intended to be representative." ' *(Ibid.)*

"Second, the argument advanced in the Nassau County *amicus* brief that such a construction would be unconstitutional because, as Judge BERGAN pointed out in *O'Brien,* the

rate would be used against parties (among which could be Nassau County) who have no standing to challenge it when it is promulgated by the administrative agency, assumes too much. It assumes that the equalization rate would be automatically applied in all cases. Unless stipulated to, such would not be the case at all. The party who seeks to use the rate will be put to his proof that such use is justified in that case. So, in the instant case, petitioner produced Samuel J. Stein, Director of Research and Statistics for the State Board of Equalization and Assessment as a witness. He interpreted the computer printouts showing data making up the rate formulation, explained how it was collected and showed that it contained specifically to the taxing unit in issue. Nowhere does the city or Nassau County argue that this evidence, which was fully open to impeachment attempts, was not relevant or probative. And although they argue that the equalization rate is not established for this purpose, overlooked is the fact that the Legislature specifically made it applicable in 1961 and reinforced this applicability in 1969, and the additional fact that while the primary purpose of the State equalization rate may be to facilitate uniform State aid to localities, there is no discernible reason why it also may not be used in individual inequality cases. Of course, the taxing authority will always be entitled to show that the equalization ratio is inappropriate to the taxing unit, to the category of property involved and to the particular property or any other valid reason which would affect its relevancy or weight. The same questions then arise as would respecting any sort of proof; its weight and application are subject to judicial decision which can be reviewed on appeal."

We come, accordingly, to the essential question in the 860 ratio appeal—the fair meaning and scope of the *Guth* decision. The ratio trial here consumed many months, cost the petitioners over $400,000 in expenses, fees and disbursements, and resulted in a 14-volume record on appeal, plus numerous cartons of exhibits. The trial was not merely a replay of the *Guth* trial but, in point of fact, an intensive and exacting examination of the SBEA's methodology applied to Nassau County, despite the fact that the *Guth* decision predated this ratio trial by several months.

At the Special Term, the petitioners took the position that the County was in effect foreclosed by *Guth* from challenging the SBEA's methodology, and that the attack on the adequacy

of its statistical processes did not meet the test of "inappropriateness" envisioned by *Guth.* The County took the position that it was entitled to challenge the relevancy and weight of the State rates as applied to Nassau County and that methodology was an integral part of that challenge. The Special Term found that the State rates were now "presumtively correct", but permitted the County to mount a direct offensive against the SBEA's entire methodology, nominally, only as it applied to Nassau, but, in fact, generally, as it applied throughout the State.

*Guth* proclaims that the State equalization rate is "objectively arrived at" and, today, "expertly arrived at" (p 450), and that its application as the sole basis for ratio was easily justified in that case, relying, in part, upon the SBEA's assertions that its methods more accurately produce the ratio of assessed value to full value than either the actual sales or selected-parcel method since, thereby, the rates are based upon larger and more representative appraisal samples. Those views, accordingly, preclude the County from attempting to establish, at bar, that the State rates are really subjectively and inexpertly arrived at and that, compared with other methods, the State rates constitute a less accurate reflection of the ratios obtaining in the County. We do not overlook the statement in *Guth* (p 451) that the taxing authority may always show that "the equalization ratio is inappropriate to the taxing unit, to the category of property involved and to the particular property or any other valid reason which would affect its relevancy or weight." It is our view, however, after examining the record and briefs submitted to the Court of Appeals, that future retrials of the SBEA's methodology were not envisioned, and that the invitation to the taxing unit to show inappropriateness is more limited than the language might, on its face, suggest.

The *Guth* record reveals that the Court of Appeals was aware of virtually every step in the SBEA's methodology when it upheld the use of the State rates. The only argument in the briefs directed to inappropriateness was marshalled by Nassau County, appearing *amicus curiae.* Its argument was to the effect that Nassau would suffer far more damage than any other taxing district if the State ratio were applied to it, because this would result in unequal assessments between properties of equal full value. The premise of this argument— that it would result in an equalization rate for a political

subdivision of the County, rather than for the County itself, to be applied in a tax review proceeding is, however, proved erroneous by this record. One could nevertheless hypothesize, however, that the State rate might be inappropriate to prove ratio where the property under review constitutes a relatively large percentage of the taxing unit's total assessed valuation. That is not, of course, the situation here.

It should also be borne in mind that the issue of appropriateness to the category of property involved is, in law, largely illusory. Although apparently honored only in the breach, the settled rule is that assessments must be made at a uniform rate or percentage of all market value for every type of property in the assessing unit *(C.H.O.B. Assoc. v Board of Assessors of County of Nassau,* 45 Misc 2d 184, affd 22 AD2d 1015, affd 16 NY2d 779). The recent decision in *Matter of Hellerstein v Assessor of Town of Islip* (37 NY2d 1) merely reiterates that this rate or percentage must be 100% of full value. This uniformity rule effectively prohibits assessment by category of property in certiorari proceedings, and this is so whether one utilizes the State equalization rate or the selected-parcel method, for both establish an average ratio for all property classes. It is, no doubt, true that use of the State equalization rate will depress the average ratio of so-called high ratio property classes, and that, if enough owners of above-average ratio properties secure reductions in their assessments, the taxing unit will experience a drop in property tax revenues and a reduction in the existing equalization rate. However, the answer to this financial dilemma is not to ignore the rule of uniformity, or to relegate the taxpayer to the time-consuming and expensive selected-parcel method of proving ratio, which has heretofore served to limit the number of certiorari proceedings and the amount of relief secured. Rather, the answer, already provided by the Court of Appeals in *Hellerstein,* is for the taxing unit to reassess all of the properties on its rolls.

Although we deem virtually all of the proof on the SBEA's methodology introduced by the County upon the 860 ratio trial to have been inadmissible under *Guth,* we have nevertheless reviewed the record in this respect. We have considered, *inter alia,* the SBEA's 80%-class sampling rule, its appraisal and value interval stratification procedures, the two-thirds rule as respects review parcels, and the use of actual sales data and sales confirmation cards. We have also reviewed the

manner in which the SBEA derives ratios for each sampled class and individual survey unit and, in the case of Nassau County, combines those unit ratios to derive a county ratio; the use of multiple surveys to get a combined ratio; and the various adjustments made for partially exempt properties and changes in the level of assessment. Upon the record in *Guth,* the Court of Appeals held that the State equalization was "objectively" and "expertly" arrived at. The record at bar does not establish otherwise.

There are, concededly, elements of judgmental interference with a purely random selection process and, at least as respects Nassau County, a separate county-wide survey would be preferable to the combined unit surveys presently in use. The manner in which the SBEA adjusts for partially exempt property is not entirely satisfactory. Still, we can in no way agree with the County's claim that the SBEA's methodology is a wholly judgmental procedure which exerts a large downward bias on the equalization rate. In this respect, the County particularly ignores the fact that the so-called aggregate class ratios advanced by its expert to demonstrate that the State rate is inaccurate were not weighted in accordance with their percentage of assessed value of the roll. Even more importantly, any downward bias which does exist is greatly offset by the upward bias inherent in the SBEA's use of aged surveys. In other words, in a time of increasing market values, as is true of the years here under review, the use of surveys made two to six years earlier than the date of the current roll will always give an equalization rate which is higher than that found by comparing current assessed and market values. In short, the County has not satisfied its burden of showing that the State rate's statistical methodology is not truly "sound, fair, representative and, in general, designed to produce an accurate result" (cf. *Matter of Tenants' Union of West Side v Beame,* 40 NY2d 133, 138). A difference in point of view between a municipality and the SBEA as to statistical procedures and their suitability is insufficient to induce judicial intervention (see *Matter of Town of Smithtown v Moore,* 14 AD2d 229, affd 11 NY2d 238).

We also note that the petitioners in 860 satisfied their limited burden under *Guth* by producing a witness, with a mathematical and statistical background, who testified to the general methodology employed in making up the County's equalization rate after interviews with SBEA officials and

examination of various supporting data and documents. We do not believe that a petitioner must produce the SBEA officials, themselves, in every case. Furthermore, the Special Term correctly denied the County's attempt to overcome its earlier order, affirmed by this court (*Matter of 860 Executive Towers v Board of Assessors of County of Nassau*, 79 Misc 2d 821, affd 47 AD2d 603), denying pretrial discovery of all of the raw data underlying some 2,000 appraisals and 6,000 sales, by use of a subpoena duces tecum. To have sanctioned such an enormously expensive and time-consuming inquiry would have crippled the operations of the SBEA and nullified the intent of both the Legislature and the *Guth* court in approving use of the State rates. In lieu of this raw data, the County was granted a list of all appraisals and sales actually used in the pertinent surveys. The County could easily have randomly selected some appraisals and sales and have either double-checked them against the information in the County Assessor's office or engaged an expert appraiser to undertake *de novo* appraisals. It could then have called any serious discrepancies to the attention of the court. Thus, the raw data denied the County did not prevent it from impeaching the State rates.

The last aspect of the County's challenge to the use of the State equalization rates, and perhaps the only aspect truly related to "inappropriateness" rather than to methodology, relates to the peculiar standing of Nassau County in the eyes of the SBEA. In our view, a fair reading of the Real Property Tax Law indicates that the Legislature intended to render State rates admissible for counties as well as for cities, towns and villages. Indeed, it is a provision in Nassau County's own governing law, and not in the Real Property Tax Law, which has caused a problem. That problem is that the SBEA has refused to grant the County formal standing with respect to the statutorily mandated notice and hearing on tentative equalization rates. Clearly, under section 609 of the County Government Law of Nassau County, the powers and duties of the old town assessors have been transferred to the County Board of Assessors (L 1936, ch 879, as amd). Hence, the latter must have standing to represent the towns in hearings before the SBEA on tentative equalization rates for those towns. Nevertheless, the SBEA's erroneous denial of standing did not prevent the County from exercising its right to challenge the final State rates by way of an article 78 proceeding pursuant

to section 760 of the Real Property Tax Law.* Nor did it render the State rates inadmissible per se in this certiorari proceeding for, as noted by the Court of Appeals in *Guth,* the standing argument erroneously assumes that the State rate would be applied automatically, without a prima facie showing that the collected data going into the rate formulation specifically pertained to the taxing unit in issue.

We are further of the opinion that, in the unlikely event an individual assessing unit suffers unique prejudice because of some peculiarity of the SBEA's methodology, future challenges should be made in the statutorily provided hearings before the SBEA and not in the courts upon a certiorari proceeding. Although the administrative challenge (and certainly the pursuance of an article 78 proceeding) should properly collaterally estop the assessing unit from challenging the SBEA's methodology again in a certiorari proceeding, as the SBEA determination is quasi-judicial in character (see *Village of Elmira Heights v Town of Horseheads,* 234 App Div 270, affd 260 NY 507; 1 NY Jur, Administrative Law, §§ 147-149), such an attack upon the State rates is already, we hold, of severely limited scope in certiorari proceedings. Thus, on balance, the assessing unit will not be prejudiced by pursuing its objections before the rate-making body itself, where that challenge properly belongs.

As concerns the selected-parcel phase of the 860 ratio trial, suffice it to say that the deficiencies of this method are nowhere better exemplified than in the case at bar. The County's selected parcels represented not only the extreme high end of the ratio spectrum, but some of the most difficult appraisal problems as well, a LILCO generating plant, the Mid-Island Shopping Plaza, the Sperry Gyroscope plant and a large department store, A & S Hempstead. Neither side chose parcels representing a fair cross section of the assessment roll. Residential property comprises approximately 70% of the County's total assessed valuation, but selected residential parcels comprised less than 1% of the parcels' assessed valuation. Public utility and railroad properties comprise about 5% of the County's total assessed valuation. Yet, the selected LILCO generating plant, by itself, had an assessed value which was equal to the assessed value of all the other 32

---

* The County failed to institute any proceeding to contest the denial of standing (cf. *Matter of Smith Co. v Ingraham,* 32 AD2d 188; *Matter of City of Rochester v Ingraham,* 52 Misc 2d 814).

selected parcels put together for the tax years 1966 through 1969. Although it was concededly the Special Term's ultimate refusal to value the LILCO and Mid-Island Shopping Plaza parcels which resulted in a selected-parcel ratio similar to the State rate for the earlier years in issue, the very fact that the use of just those two parcels would have raised the selected parcel ratio by about 10% for some years demonstrates the incongruity and unfairness of their inclusion in the first place.

Accordingly, the interlocutory judgment in the first above-captioned proceeding which, in determining the applicable ratios for the tax years under review, rejected the County's challenge to the use of the State equalization rates, should be affirmed.

The County's appeal in the second above-captioned proceeding from a judgment awarding the petitioning taxpayers their reasonable costs and expenses in making proof of ratio upon the joint trial, pursuant to subdivision 2 of section 716 of the Real Property Tax Law, is without merit. Having proved the correct ratios to be not in excess of the ones for which stipulation was sought and rejected, the petitioners may be awarded reasonable expenses incurred in making their proof (Real Property Tax Law, § 716, subd 2; *Guth Realty v Gingold,* 34 NY2d 440, 452, *supra).* The judgment should, therefore, be affirmed.

Finally, in the third, fourth and fifth above-captioned actions under review are three orders which granted the petitioning taxpayers partial summary judgment on the issue of inequality for the tax years in issue on the basis of the interlocutory judgment in the 860 ratio trial. The affected certiorari proceedings were some of those which had been blocked on the calendar by the 860 proceeding. The County had proposed to litigate the inequality issue *de novo* in these proceedings, challenging the SBEA methodology all over again. Special Term invoked the doctrine of collateral estoppel against the County, precluding it from relitigating the issue as to the applicability of the State equalization rates. Its determinations should be affirmed.

Collateral estoppel may be asserted by a stranger to a prior suit or proceeding, provided that the party against whom the estoppel is directed had a full and fair opportunity to litigate the identical issue or issues *(Schwartz v Public Administrator of County of Bronx,* 24 NY2d 65, 71). The doctrine is, of course, not blindly applied; the circumstances must be care-

fully examined in each case to make certain that the party said to be estopped would not be unfairly or prejudicially treated *(Read v Sacco,* 49 AD2d 471, 474). Here it appears without doubt that the County is raising the identical issues in the later proceedings concerning the validity of the statistical methods of SBEA which it did in the 860 proceeding. Moreover, the review which we have made of the evidence submitted in the 860 proceeding shows that the County fully litigated the issues, and cannot be prejudiced by the ruling of the Special Term that it is now precluded from raising the same issues again. Surely, it would constitute a waste of time, energy and money to permit the issues to be tried once more by the introduction of the lengthy and technical evidence which was offered in the 860 proceeding (cf. *McCrory Corp. v Gingold,* 52 AD2d 23, 26-27 [GOLDMAN, J.]).

MARTUSCELLO, RABIN, SHAPIRO and TITONE, JJ., concur.

Judgment and interlocutory judgment of the Supreme Court, Nassau County, entered December 8, 1975 and July 30, 1975, respectively, affirmed, with separate bills of costs.

Orders of the Supreme Court, Nassau County, entered November 13, 1975, affirmed and order of the same court, entered November 14, 1975, affirmed insofar as appealed from, with separate bills of $50 costs and disbursements.