OPINION OF THE COURT
Thomas P. Farley, J.

The Motion

In this consolidated proceeding to review assessments levied against real property, the court, on June 14, 1978, granted petitioner’s motion for partial summary judgment, and directed that the ratio to be applied at the trial for the tax years at issue (May 1, 1965 through May 1, 1978) be those promulgated by the State Board of Equalization and Assessment.[1] By this motion, the respondents, constituting the Board of Assessors and Board of Assessment Review of the County of Nassau,[2] seek reargument and rehearing of that determination.
The basis for relief, insofar as reargument is sought, rests on respondents’ assertion the court misinterpreted the intent, application and effect of the 1977 amendments made to subdivision 3 of section 720 of the Real Property Tax Law (see L 1977, chs 888, 890). The arguments addressed by respondents to this aspect of its motion are repetitious and unpersuasive. The 1977 amendments, in any event, have been repealed (L 1978, ch 476, § 2, eff July 11, 1978). The branch of the application requesting reargument is denied.
The request for rehearing is based on the circumstance that the Legislature, following the court’s decision, again amended *639 the Real Property Tax Law by adding section 307 (L 1978, ch 476). Section 3 of chapter 476 of the Laws of 1978 states the provisions of this act shall be construed to be remedial and deemed to correct the imperfections in chapters 888 and 890 of the Laws of 1977. Respondent maintains these amendments verify that the position it took on the original motion expressed the true intention of the Legislature. The numerous and critical issues created by the new law admits of no easy solution.

Hellerstein and Ratio

Chapter 476 of the Laws of 1978 appears designed to afford municipalities a temporary reprieve from the twofold consequences visited upon taxing districts by the Hellerstein case[3] and the ratio decisions.[4] In Hellerstein, the traditional practice of assessing at a percent of full value was declared illegal, and the court mandated that all real property be assessed at 100% of value in accordance with the statutory direction (Real Property Tax Law, § 306). Guth Realty v Gingold (41 AD2d 479, affd 34 NY2d 440) and 860 Executive Towers v Board of Assessors of County of Nassau (84 Misc 2d 525, affd 53 AD2d 463) authorized the admission of the State equalization rates to establish ratio in an inequality trial brought under subdivision 3 of section 720 of the Real Property Tax Law. A summary review of these cases is helpful to placing the new legislation in proper perspective.
The settled rule, until the advent of Hellerstein, was that assessments must be made at a uniform rate or percentage of full market value for every type or category of property in the assessing unit (C. H O. B. Assoc, v Board of Assessors of County of Nassau, 45 Misc 2d 184, affd 22 AD2d 1015, affd 16 NY2d 779).[5] This rule was largely honored only in its breach (860 Executive Towers v Board of Assessors of County of Nassau, 53 AD2d 463, 471, supra), because assessors customarily assessed residential at lower levels of assessment than commercial property (The Real Property Tax, 1975 Report of Temporary State Commission on State and Local Finances, vol *640 2, pp 22, 47; 1974 Report of State Commission on Eminent Domain and Real Property Tax Assessment Review, pp 209-210).[6] The use of this uniform rate tended to obscure this discriminatory practice (Matter of Hellerstein v Assessor of Town of Islip, supra, p 13), and its application gave an aura of equality to the assessment.
Employment of fractional assessments also converted a tax review proceeding based on inequality into a dual trial. The taxpayer had to establish the value of his property as well as its assessment at a higher proportion (ratio) than the aggregate value of all property in the taxing district (Real Property Tax Law, § 720, subd 3; Matter of Wolf v Assessors of Town of Hanover, 308 NY 416).[7] The difficulty with establishing this ratio was that the parties, by command of statute (Real Property Tax Law, § 720, subd 3), were limited in their proof to the selection of sample parcels except that evidence could also be offered as to actual sales. In People ex rel. Yaras v Kinnaw (303 NY 224), decided in 1951, this limitation was held to exclude proof of equalization rates.
Equalization rates were designed primarily to serve as a basis for the apportionment of tax burdens between towns and districts. Since this purpose could be accomplished by rough estimates without reflecting the true ratio of assessments to value within a tax district, their reliability was suspect (People ex rel. Yaras v Kinnaw, supra, pp 230-231).
Proof of ratio by the sample parcel method was thus perpetuated although this procedure was so costly and burdensome as to put its use beyond the resources of the average taxpayer.[8] In recognition of this difficulty, the Legislature *641 amended the statute in 1961 to allow for the introduction in evidence of the State equalization rates[9] in an inequality trial. This remedial legislation was frustrated when the court found the State rates by themselves were insufficient to sustain a finding of inequality in a particular assessment (Matter of O’Brien v Assessor of Town Mamaroneck, 20 NY2d 587).
The statute (Real Property Tax Law, § 720) was amended again in 1969, and the Court of Appeals in Guth Realty v Gingold (34 NY2d 440, supra) ruled the State equalization rates standing alone were admissible as prima facie evidence of ratio. The question was raised once more, and the court reaffirmed the holding in Guth, and found reliance on SBEA rates to prove ratio was justified (860 Executive Towers v Board of Assessors of County of Nassau, 53 AD2d 463, supra).
The previously mentioned variations in the percent of full value at which different classes of real property are assessed produced assessments on commercial property that greatly exceeded the State equalization rates (1974 Report of State Commission on Eminent Domain and Real Property Tax Assessment Review, pp 209-210; Assessment Administration, Assembly Ways and Means Committee, Jan. 24, 1978, p 2). Few taxpayers, prior to Guth, could afford the time and expense of a ratio trial, and this disparity largely remained unchallenged. However, Guth and 860 Executive Towers armed the taxpayer with a simple and expedient solution to the ratio problem following more than 25 years of litigation. Its impact was not insignificant. Municipalities were soon besieged with a startling wave of protests and proceedings based on inequality.[10] It has been estimated that State-wide refunds in these proceedings may reach one billion dollars, but this figure may admittedly be on the low side (Beebe & Sinnott, In the Wake of Hellerstein: Whither New York, State Division of Equalization and Assessment, 1977, p 285). In the City of New York alone, one estimate places the costs of rebates between 1.7 and 2.7 billion dollars.
By its decision in Hellerstein, the Court of Appeals provided *642 a State-wide remedy to unequal assessment by decreeing that all real property be assessed at full value. Guth and 860 Executive Towers have, in effect, bestowed on taxpayers a comparable individual remedy. This has given rise to fears that the payment of refunds to the owners of commercial property will result in a significant shift of the tax burden to residential homeowners, and cause a serious erosion in the tax base of assessing units. A similar concern, expressed when Hellerstein was decided, has been allayed by the moratorium which delays implementation of the full value standard of assessment.[11] On the other hand, the consequences posed by taxpayer inequality suits must be faced immediately.[12] Chapter 476 of the Laws of 1978 is addressed to alleviation of this dilemma during the transitional period that full value assessment is not achieved.

The Statute: Section 307 of the Real Property Tax Law

Section 307, as added by chapter 476 of the Laws of 1978, grants to certain assessing units an exemption from complying with the full value standard of assessment set forth in section 306 until December 31, 1980. The units so exempt are those which, by local law, ordinance, resolution or executive order, provide for the physical revaluation of their real property and are implementing such program with all deliberate speed. The exemption is also made applicable to a county which provides for such revaluation on behalf of assessing units. This latter provision extends the coverage of section 307 to Tompkins and Nassau Counties which are the only two counties where assessments are levied on a county-wide basis.
Although petitioners deny that Nassau County is entitled to the exemption,- the court finds the county, by Ordinance No. 922 of 1977, has initiated and committed itself to a program of revaluation and is entitled to the benefits provided by section 307.
Under subdivision 2 of section 307, each assessing unit that qualifies for the exemption mentioned above is required, dur *643 ing the period of exemption, to assess its real property at not more than the full value thereof. This is the standard of assessment mandated by the Constitution (NY Const, art XVI, § 2) as distinguished from the statutory standard that directs all real property be assessed at its full value (Real Property Tax Law, § 306). The difference between the two standards is more semantic than real.
Subdivision 3 of section 307 states a petition based on inequality brought against a unit exempt from complying with the full value standard of assessment shall allege that the assessment has been made at a higher proportionate valuation than the assessment of other taxable real property of the same major type, as determined by the State Board of Equalization and Assessment pursuant to section 1200. The last portion of subdivision 3 of section 307 states evidence to such effect (class rate)[13] may be introduced together with such evidence otherwise admissible under subdivision 3 of section 720 of the Real Property Tax Law.
Subdivision 4 of section 307 provides the petitions in pending proceedings may be amended to conform with its provision which presumably means the petitions may be corrected to allege class inequality rather than inequality to all property within the taxing jurisdiction.
Under subdivision 5 of section 307, the thrust of the legislation is made retroactive by making its provisions applicable to all pending proceedings.

De Facto and De Jure Assessments

Under section 2 of article XVI of the New York Constitution, the Legislature is charged with the duty to "provide for the supervision, review and equalization of assessments for the purpose of taxation.” The power of taxation is plenary and rests exclusively in the Legislature (Genet v City of Brooklyn, 99 NY 296, 306). It may classify property for tax purposes in any manner it deems appropriate (People ex rel. Hudson Riv. Day Line v Franck, 257 NY 69), and what it determines in respect of policy, it is also competent to change (People ex rel. Clark v Gilchrist, 243 NY 173; Bradford v County of Suffolk, 257 App Div 777, affd and mod on other grounds 283 NY 503). It may impose a heavy burden on one class of property and no *644 burden at all upon others; the remedy for injudicious action being in the hands of the people, not the courts (People ex rel. Hatch v Reardon, 184 NY 431, 445, affd 204 US 152). So long as the class subjected to taxation is determined by some reasonable policy of differentiation, and all in the same class have equality, the measure meets constitutional standards of equal protection (New York Steam Corp. v City of New York, 268 NY 137, 146-147). That a "fairer” taxing formula might have been adopted is of no moment (Matter of Long Is. Light. Co. v State Tax Comm., 45 NY2d 529, 535).
The cited authorities make clear that the imposition of a classified system of assessment is constitutionally permissible. The question is whether section 307 represents a valid exercise of that power. The purpose of exempting taxing jurisdictions from complying with the full value standard of assessment contained in section 306 is to permit assessment at fractions of value pending completion of revaluation programs. The system of assessment declared illegal in Heller-stein is thereby temporarily continued. The exemption granted under section 307 cuts much deeper by authorizing the assessment of different classes of property at different fractions of value.
The new law is construed by the county as giving de jure recognition of the de facto system that prevails throughout the State and therefore immune from attack on constitutional grounds. Undeniably, this position is given some credence by the practice of assessing different categories of property at various levels of value. However, the county’s reliance on Nashville, Chattanooga & St. Louis Ry. Co. v Browning (310 US 362) is misplaced. The situation which formerly existed in Tennessee is not analogous to that prevailing in New York. At the time of Nashville, the property of public service corporations in Tennessee was assessed by a commission and all other property by local assessors. The commission steadfastly assessed railroads at 100% of value, while local officials valued other property below its true worth. The Supreme Court found this system to be a settled State practice, and said (pp 368-369): "That the states may classify property for taxation * * * may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate * * * [T]he only question relevant for us is whether the state has done so. * * * If the state supreme court had construed *645 the requirement of uniformity in the Tennessee Constitution so as to permit recognition of these diversities, no appeal could successfully be made to the Fourteenth Amendment.”
In New York, the inequality that stems from assessing at a percent of full value was at an early date characterized as a flagrant violation of the statutory requirement (Van Rensselaer v Witbeck, 7 NY 517), and later declared illegal in Hellerstein. The latter case additionally observed that this plain provision of the statute (§ 306) could not be smothered by the accumulation of customs or violation (37 NY2d 1, 10, supra). Prior to Hellerstein, there was tacit approval only of fractional assessment of all property but not of its separate classes. This distinction did not escape the Appellate Division in the 860 Executive Towers case. It noted the pre-Hellerstein rule that assessments be made at a uniform rate or percentage of all market value for every type of property effectively prohibits assessment by category in certiorari proceedings (53 AD2d 463, 471, supra). Long before 860 Executive Towers the courts had similarly rejected the claims of taxpayers to have their assessments reduced because overassessed when compared to like property owned by their neighbors.
”[T]he petitioner must show a state of facts from which a presumption justly arises that the inequality of which he complains will subject him to the payment of more than his just proportion of the aggregate tax, and that this presumption is not raised by proof that in a particular instance property is assessed at a proportionately lower valuation than his own. Nor does it, we think, make any difference that the assessments compared were of contiguous property. The object of the statute was to afford a remedy to a party injured by unequal valuations, not to enable him, on mere proof of a mistake or misjudgment of the assessors, as to the relative valuation of his property and that of another, to have his assessment reduced” (People ex rel. Warren v Carter, 109 NY 576, 581-582; emphasis supplied).
In the face of the foregoing pronouncements, the court here cannot find there has been a systematic judicial sanction of any State-wide de facto classification of property.[14] The conclu *646 sion is inescapable that section 307 does not represent a codification of an existing assessment procedure. What is involved is a substantial and new standard authorizing fractional assessment by class during the transitional period in which assessment at 100% is delayed.

Classified Assessment and Rates

The first question under any classified system of assessment must be the determination of the separate classes. Subdivision 3 of section 307 makes reference to the classes "as determined by the state board of equalization and assessment pursuant to section twelve hundred of this chapter”. The latter section states: "[T]he state board shall, as part of its procedure for establishing state equalization rates pursuant to this article, sample the ratio of assessments to market values for each major type of taxable real property”.
At present, the SBEA has segregated all real property into nine classes (Property Type Classification Codes, N. Y. State Div. of Equalization and Assessment, May, 1977). In the past, the State board had as many as 17 classes (see 860 Executive Towers v Board of Assessors of County of Nassau, 43 AD2d 910, supra), and occasionally listed certain types, such as apartments, as a separate category in some years but not in others. The difficulty in cataloguing property into classes is apparent,[15] and the Legislature has not undertaken to define the classes. Under the procedures followed by the SBEA, only those classes of property that account for 85% of the assessed value of the roll in an assessing unit are actually surveyed[16] (The Equalization Rate in the Property Tax: What it is and What it Does, State Board of Equalization and Assessment, Dec., 1976, p 15). Thus, if one category of property, such as residential, equals 85% of the assessed value of all property in the assessing unit, no other classes are sampled. Consequently, there exists the likelihood of classes for which no data is collected.[17]
*647 Since chapter 476 of the Laws of 1978 does not define the classes of real property but refers instead to the classes, as determined by the SBEA, the board must be presumed empowered with that function. The classification of what property is to be taxed, however, is a legislative power (People ex rel. Hudson Riv. Day Line v Franck, 257 NY 69, supra) that cannot be delegated unless accompanied by reasonable safeguards and standards (Matter of Levine v Whalen, 39 NY2d 510). Chapter 476 contains none. It is handbook law that a legislative body may confer upon an administrative board a measure of discretion, but it must at the same time define the limits of that discretion and fix the rules or standards which must govern its exercise (Matter of Small v Moss, 279 NY 288, 295).
This objection is not resolved by saying the classes already exist. As shown before, the major types of property defined by the SBEA have in the past not only differed in number, but overlapped. In the absence of guidelines, the determination of what type of property is to be included in each class is left to the unfettered discretion of the State board. A more unlawful delegation of a legislative function is hardly imaginable. Actually, the segregation of property into classes by the SBEA has little significance as far as the issues presented on this motion are concerned. The over-all goal of the sampling procedures is to attain statistical accuracy. Classes were not formulated to assess the different categories of property, but simply to determine the single rate at which all property in a tax district should be equalized. That function of the SBEA is set out in section 1202.[18]
Another deterrent to sustaining the validity of chapter 476 of the Laws of 1978 lies in its provisions that would vest in the local assessor the power of selecting the percent or rate at which property would be assessed. This function is presently performed by him (Matter of Drelich v Kahn, 60 Misc 2d 227) but would be extended to allow determination of the rate applicable to the various classes of property. The distinguishing feature of the new law is that the rate found by the *648 individual assessor, which previously was a single rate applicable to all property alike, would differ as to each category of property. It is, however, "incompetent for the legislature to leave to a state officer or department the power to determine whether a tax should be levied, or at what rate, or upon what property”. (Gautier v Ditmar, 204 NY 20, 28.)
A law which leaves to the assessor the determination that one class of property shall be assessed at a specified percent, and at another percent in a contiguous taxing unit is unconstitutional both for indefiniteness, and for being in violation of the due process and equal protection clauses of the Fourteenth Amendment (Weissinger v Boswell, 330 F Supp 615). No matter how good the motives of the taxing officers, the vesting of the assessors with the discretion of taxing the same class of property at different rates in each different locality must necessarily result in a discriminatory system of taxation (Weissinger v Boswell, supra, pp 624-625). Such a system defeats the judicially declared constitutional requirement of this State that there be "[ejquality and uniformity of taxation * * * for, if one taxpayer escapes payment, the burden is placed — disproportionately and unfairly — on another.” (Johnson v Smith, 297 NY 165, 170.) This principle was recently reiterated by the Court of Appeals in a tax certiorari proceeding as follows: "[A]n underlying aim of valuation is to assure that * * * the share reasonably to be borne by the particular property owner is based on an equitable proportioning of the fair value of his property vis-á-vis the fair value of all other taxable properties in the same tax jurisdiction.” (Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d 538, 544.) In summary, insofar as chapter 476 of the Laws of 1978 authorizes a system of assessment under which the State board is left without guidelines for determining the major types of property, and the assessor is empowered, at his discretion, to select the ratios at which the different categories may be assessed, it constitutes an unconstitutional delegation of a basic legislative function. The lack of uniformity and equality inherent in the system necessarily results in the deprivation of due process and the equal protection of the laws to property owners. This conclusion, because of the critical importance of the legislation, is reached reluctantly, but a judicial tribunal for the sake of expediency or even the stability of government cannot be deterred from its duty (Flushing Nat. Bank v Municipal Assistance Corp. for City of N. Y., 40 NY2d 731).
*649 It is noteworthy that class rates are neither maintained nor published by the SBEA. Its counsel, moreover, flatly denies their existence. In a memorandum to the Governor, disapproving of chapter 476, he stated: "This language assumes that a ratio of assessed to market value for each major type of property is determined by the State Board for every assessment roll pursuant to section 1200 of the Real Property Tax Law. This is not the case * * * The State Board does not determine ratios of assessed to market value for the major types of property for any assessment roll; such determinations are made by staff only in conjunction with statewide surveys for certain major property types (in accordance with State Board procedures) * * * Accordingly, the evidence to be introduced pursuant to subdivision 3 of section 307 does not exist.”
On the other hand, both the county and the Assembly Ways and Means Committee (see Assessment Administration, Assembly Ways and Means Committee, Jan. 24, 1978, p 10) suggest class ratios for major types of property may be extracted from data and information on file with the SBEA. The county represents it already has done so, and urges that where data for a particular class is lacking, the ratio may be obtained by resorting to the sample parcel method. The conflict between these viewpoints revolves about the accuracy and reliability of culling multiple rates from current SBEA data. The opposing views present issues of fact that could not be resolved without the conduct of a hearing. In view of the determination that the legislation is unenforceable for the reasons set forth, no hearing is necessary, and this aspect of the new statute need not be pursued. Although the same reasoning likewise renders discussion of other provisions of the statute unnecessary, the importance of the legislation and the facilitation of appellate review make comment on its retroactivity advisable.

Retroactivity

The provisions of subdivision 5 of section 307 that make it applicable to pending proceedings, present another question of constiutional dimension. The scope of the statute’s retroactivity is readily discernible from the petitions filed in the instant proceedings that relate to assessments levied as far back as the 1965-1966 tax year. Fortunately, the number of proceedings of the same vintage now on the court’s calendar is not large, but the majority do involve the review of assessments imposed over five years ago.
*650 Whether a statute, which by its express terms is retroactive, will be sustained is usually a question of degree (People ex rel. Beck v Graves, 280 NY 405, 409). In the field of taxation especially, retroactivity for short periods has been upheld as constitutionally permissible (Welch v Henry, 305 US 134; Matter of Lacidem Realty Corp. v Graves, 288 NY 354; Matter of Neuner v Weyant, 63 AD2d 290). However, the constitutional validity of the law is to be tested, not by what has been done under it, but what may, by its authority, be done. (Stuart v Palmer, 74 NY 183, 188.)
The law that prevailed in tax certiorari proceedings, prior to the enactment of section 307, has already been outlined. Briefly, it required that real property be assessed at a uniform ratio ascertained by comparing the total assessed valuation of all categories of property in the taxing district with the aggregate of their full values (People ex rel. Hagy v Lewis, 280 NY 184, 187-188; 860 Executive Towers v Board of Assessors of County of Nassau, 53 AD2d 463, supra). Inequality was established when the subject parcel was assessed at a ratio higher than the average determined in the manner set forth (People ex rel. Yaras v Kinnaw, 303 NY 224, supra).
Under chapter 476 of the Laws of 1978, proof of inequality is radically changed. Under its provisions, inequality can only be shown by establishing that the subject parcel is assessed at a greater ratio than property of the same class. The change substitutes a class ratio for an over-all average ratio. By so doing, the statute increases or decreases the amount at which property could be initially assessed. The net effect of the legislation is to give approval to a change in assessments made long ago. It does so, not for the purpose of collecting additional tax where a decrease in assessments might be in order, but to cut off refunds to taxpayers who filed protests claiming they were excessively taxed when the assessments were levied and paid. The question is whether the Legislature may do so retroactively.
The period of retroactivity here involved reaches assessments levied so far in the past as to be oppressive and unjust. The period of time far exceeds the limits of retroactivity approved in the prior-cited cases, and is unreasonable when applied to assessments levied from 5 to 10 years ago (People ex rel. Beck v Graves, supra).
It is argued by respondent that the legislation is a remedial statute applying procedural and evidentiary amendments.
*651 That the statute, when considered in its entirety, is a substantive enactment may be gleaned from its placement in article 3 of the Real Property Tax Law, alongside section 306. It provides for a new standard of assessment, and is no less substantive than section 306 whose provisions it temporarily replaces insofar as qualified jurisdictions are concerned.
The argument is also advanced that the statute’s retroactivity affects no vested rights as the refunds of which property owners may be deprived are contingent and unliquidated. Judicial sanction of the retroactive aspects of the legislation is not to be judged strictly from the concept of vested rights but by a balancing of all the factors including considerations of fairness, reliance on pre-existing law, the extent of retroactivity, and the public interest to be served (Matter of Chrysler Props, v Morris, 23 NY2d 515).
Where a taxpayer is assessed for more than his proportionate share of taxes, the right to be refunded the excess payment is statutorily protected (Real Property Tax Law, § 726), and accrues at the time the tax is paid (Matter of Furey v Graves, 148 Misc 785, affd 241 App Div 897, affd 266 NY 415). Taxpayers, who resorted to litigation to enforce their rights in reliance on the pre-existing law, are, by virtue of the statute, divested of a remedy. The legislation therefor compels them to bear an unequal share of a tax burden imposed, in many instances, many years ago.
It is no answer to say the statute does not impose any additional tax. The infirmity arises from the fact that a tax burden previously imposed uniformly against all owners of property is now being recharged unequally to a select class. Although the policy of the statute seeks to avoid a drastic shift in real property tax burdens, its primary purpose is the insulation of municipalities from the fiscal impact of tax inequality proceedings. The refunds emanating from this type of litigation flow from deficiencies in assessment procedures long disregarded. Under these circumstances, a balancing of all the factors considered, does not dictate that the consequences of past assessment practices should be cast upon select group of property owners by giving approval to the retroactive provisions of section 307 (Matter of Chrysler Props, v Morris, supra). Payment of the refunds does not result in a "windfall” as characterized by the respondent, but in the return of a tax burden disproportionately assessed. The attempt to make subdivision 5 of section 307 applicable to pending proceedings *652 constitutes, in the opinion of the court, a denial of equal protection.
The branch of the motion requesting renewal is granted, and upon consideration of the additional facts presented, is denied.

. This agency is referred to throughout this decision as the State board or the SBEA.

. The respondents are identified for the sake of brevity in the singular as respondent, county or board of assessors.

. (.Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, remittitur amd 39 NY2d 920.)

. (Guth Realty v Gingold, 41 AD2d 479, affd 34 NY2d 440; 860 Executive Towers v Board of Assessors of County of Nassau, 84 Mise 2d 525, affd 53 AD2d 463, affd sub nom. Matter of Pierre Pellaton Apts, v Board of Assessors of County of Nassau, 43 NY2d 769).

. The Court of Appeals in Hellerstein noted that its affirmance of the cited case did not imply the sanctioning of fractional assessments (37 NY2d 1, 8, supra).

. Variations in the level of assessment (the amount of full value the assessor treats as taxable) actually exists not only between different classes of property but within property of the same class as well (1975 Report of Temporary Commission on State and Local Finances, vol 2, p 56). Correction of inter- and inira-class inequality will be accomplished by assessment at 100% of full value, but more emphasis has been placed on interclass dispersion in assessment since its rectification will create a more significant shift in the burden of tax (Assessment Administration, Assembly Ways and Means Committee, Jan. 24,1978, pp 11-14).

. The sum and substance of an inequality trial is the ascertainment of the full value of all property in the taxing district, the computation of their rate of assessment to the whole, and a comparison of their average rate of assessment with that of the subject parcel (Matter of Wolf v Assessors of Town of Hanover, 308 NY, supra, p 423).

. The costs incurred by petitioners in the 860 Executive Towers case was $435,691 (860 Executive Towers v Board of Assessors of County of Nassau, 84 Mise 2d 525, affd 53 AD2d 463, 469).

. An equalization rate is a measurement of the relationship of total taxable assessed value to total taxable full value in an assessing unit (The Equalization Rate in the Property Tax: What it is and What it Does, State Board of Equalization and Assessment, Dec., 1976, p 3).

. There are 125,000 petitions to review assessments for alleged inequality now pending in the City of New York according to the city Corporation Counsel. The number in Nassau County is over 29,000 of which 1,800 are pending on the court’s calendar.

. The Court of Appeals, recognizing that its mandate could have calamitous consequences, allowed time for compliance with its directive (Matter of Hellerstein v Assessor of Town of Islip, 39 NY2d 920, supra). A similar judicial extension has been granted to Nassau County (Forte v Board of Assessors of County of Nassau, 57 AD2d 915). In addition, the Legislature has extended until December 30, 1980, the time in which certain taxing jurisdictions must complete their program of revaluation (see L 1977, ch 888, § 1; L 1978, ch 163, § 1).

. So long as taxing districts delay revamping their assessment procedures in accordance with Hellerstein, this difficulty will persist.

. A class rate is the ratio which the total assessed value of a particular class of property (e.g., residential) bears to its full value. The ratio set forth in subdivision 3 of section 720 is obtained by comparing the total assessed value of all categories of property with their aggregate full value.

. Twenty-seven years after Nashville was decided, the same plaintiff succeeded in having the Tennessee assessment practices declared unconstituttional upon showing the discriminatory assessment practice violated State constitutional and statutory standards (Louisville & Nashville R. R. Co. v Public Serv. Comm, of Term., 249 F Supp 894, affd 389 F2d 247).

. The Assembly Ways and Means Committee reported that 10 classes had been defined historically (Assessment Administration, Assembly Ways and Means Committee, Jan. 24, 1978, p 10).

. An exception to this rule requires certain large unit parcels to be included in the survey, e.g., industrial and commercial property comprising at least 4% of the assessment roll of a city or town or 8% of a village. •

. At the time 860 Executive Towers was decided at the trial level, SBEA’s procedure only required the sampling of those classifications which accounted for 80% of the assessed value (860 Executive Towers v Board of Assessors of County of Nassau, 84 Misc 2d 525, 538, supra).

. The ratio converts assessed value to full market value within a governmental unit, and is primarily used for determining constitutional tax and debt limits; distribution of State education aid, revenue sharing, and the allocation of tax burdens between municipalities and school districts (Assessment Administration, Assembly Ways and Means Committee, Jan. 24, 1978, p 10). In all, the State equalization rates are used for 37 separate purposes.