In the Matter of HIRAM JOHNSON et al., Appellants-Respondents, v TOWN OF HAVERSTRAW et al., Respondents-Appellants.

Second Department, July 2, 1984

**APPEARANCES OF COUNSEL**

*Lee, LeForestier, Shapiro, Goodfriend & Murphy (Milton B. Shapiro* of counsel), for appellants-respondents.

*Arthur Moskoff, Town Attorney,* for respondents-appellants.

**OPINION OF THE COURT**

THOMPSON, J.

The core issue on these appeals is whether petitioners established ratio in their effort to prove inequality of their

assessments. We hold that they did for the years in issue, 1974 through 1978.

The property that is the subject of the instant proceeding, known as Town 'n Country Condominiums, is located in the Town of Haverstraw. The property is improved with 39 garden apartment structures containing 390 single-family condominium dwelling units and a separate recreation building containing facilities for the use of the condominium owners. The recreation building, situated on a separate tax lot, is not under review in these proceedings. Each apartment unit is separately assessed and listed on the town tax map. Not all lots or units are involved in all of the years under review.

The protests and petitions with respect to each year are based on alleged overvaluation, illegality, and inequality.

Two expert real estate appraisers testified at trial. Petitioners' real estate appraiser testified that the following were the total fair market values for the properties in question in the years under review:

| | TOTAL FAIR MARKET VALUES |
| ASSESSMENT YEAR | ALL UNITS |
| --- | --- |
| 1974 (Condominium I only) | $2,590,000 |
| 1975 (Condominiums I and II) | $5,890,000 |
| 1976 (Condominiums I and II) | $6,090,000 |
| 1977 (Condominiums I and II) | $6,275,000 |
| 1978 (Condominiums I and II) | $6,275,000. |

The town's real estate expert stated that the fair market values were:

| | TOTAL FAIR MARKET VALUES |
| ASSESSMENT YEAR | ALL UNITS |
| --- | --- |
| 1974 (Condominiums I and II) | $12,570,010 |
| 1975 (Condominiums I and II) | $12,643,780 |
| 1976 (Condominiums I and II) | $12,505,370 |
| 1977 (Condominiums I and II) | $12,505,370 |
| 1978 (Condominiums I and II) | $12,779,875. |

In presenting evidence of the alleged inequality of assessments, petitioners attempted to comply with the "justification" requirement of *Guth Realty v Gingold* (34 NY2d

440). In *Guth* (*supra,* pp 450-451), the Court of Appeals held:

"The memorandum in support of the measure submitted by the State Board of Equalization and Assessment (N.Y. Legis. Annual, 1969, p. 439) emphasizes that the equalization rates today reflect more accurately the ratio of assessed value to full value than the ratio produced by either the actual sales or selected parcels methods. '"This is so because the state rates are based upon larger appraisal samples than those presented to the court under present law. Also state rates are based upon samples of representative classes while the parcels in a parcels proceeding are not intended to be representative."' (*Ibid.*)

"Second, the argument advanced in the Nassau County *amicus* brief that such a construction would be unconstitutional because, as Judge BERGAN pointed out in *O'Brien* [*Matter of O'Brien v Assessor,* 20 NY2d 587], the rate would be used against parties (among which could be Nassau County) who have no standing to challenge it when it is promulgated by the administrative agency, assumes too much. *It assumes that the equalization rate would be automatically applied in all cases. Unless stipulated to,* such would not be the case at all. *The party who seeks to use the rate will be put to his proof that such use is justified in that case * * * Of course, the taxing authority will always be entitled to show that the equalization ratio is inappropriate to the taxing unit, to the category of property involved and to the particular property or any other valid reason which would affect its relevancy or weight. The same questions then arise as would respecting any sort of proof; its weight and application are subject to judicial decision which can be reviewed on appeal" (emphasis supplied).

At the trial held in March, 1979,[1] petitioners' attempt to comply with *Guth* and to establish the inequality of assessments consisted of the following evidence:

Petitioners called Cornelius P. Mahon, the town's appraiser, who conceded that his appraisal report used State

---

1. The trial decision states (102 Misc 2d 923, 927) that the proceedings "were tried * * * in March, 1979, but not fully submitted until November". We note, however, that the evidence was completed in March, 1979 and both sides rested in March, 1979, although the parties were given further time to submit briefs.

equalization rates to the extent of multiplying the annual tax rate by the equalization rate to obtain the tax rate factor used to compute his over-all capitalization rate. He was of the opinion that the equalization rates were "appropriate'" rates to use. On cross-examination, he testified that he had no independent studies to determine whether the State rate was accurate and represented the correct ratios between assessment and full market values; he just accepted whatever information he received from the State Board of Equalization and Assessment (SBEA). However, he thought that the State rate was "appropriate because it was the rate set by the State and it was the only rate available to me to use in establishing a cap rate".

Petitioners served notices to admit ratio[2] pursuant to section 716 of the Real Property Tax Law, which provides, in pertinent part: "§ 716. Admission of percentage of full value at which real property is assessed. 1. Except in a proceeding to review a special franchise assessment, at any time after answer has been served or has been deemed made and not later than twenty days before the trial, the petitioner may serve upon the respondent a demand for admission for the purposes of such proceeding that the percentage of full value at which other real property is assessed in the unit is a percentage specified in such demand, but not in excess of ninety-five per centum. Unless the respondent within fifteen days after service of such demand, or within such further time as the court may allow on motion on notice, serves and files a notice specifically denying that the percentage specified in such demand is correct, such percentage shall be deemed admitted".

The following is an example of petitioners' notice to admit ratio:

"PLEASE TAKE NOTICE that you, the above named respondent, are hereby required for the purposes of this proceeding to admit that 34.26 percent is the ratio which the assessed valuation of the real property of the assessing unit bears to its full value, and that, in any event, the said percentage shall be deemed admitted by you to be such

2. The final State equalization rates for 1978 had not been established at the time of the main, March, 1979 trial. Accordingly, at that trial petitioners' attorney asked to reserve the question of the rate for 1978 until after the final rate was determined.

ratio unless, not more than fifteen days after the service of this demand, or within such further time as the court may allow on motion on notice, you serve and file a notice specifically denying that such percentage specified is the correct ratio.

"Dated: November 28, 1978".

The ratios used in the notices to admit ratio (Real Property Tax Law, § 716), were the State equalization rates.

The town's sample response was:

"Respondent Town of Haverstraw, responding to petitioner's Demand dated November 28, 1978, respectfully states that it does not understand the language set forth in said Demand or comprehend its meaning or intent, or is not required to speculate on the intent of the petitioner [sic] herein in setting forth said Demand and must therefore respectfully deny said Demand.

"Dated: December 12, 1978".

Petitioners also placed into evidence "notices to admit truth of facts" and a document marked petitioners' exhibit 24, which was the town's only response thereto, and which applied *only* to 1978. The notices to admit were extensive in scope. The following is a sampling and summary of various items which the town was asked to admit:

"1. That the State equalization rate for THE TOWN OF HAVERSTRAW for the year 1974 was 34.26%.

"2. That [under various specified State statutes] THE TOWN OF HAVERSTRAW was eligible for and received State aid, which aid was computed and determined by use and application of the State equalization rate for the [years in issue] * * *

"3. That [with respect to various specified State statutes, the town] had its portion of taxes for all and any joint school districts, joint special districts, joint fire districts and judicial districts computed and determined by use and application of the State equalization rate applicable * * *

"4. That [with respect to various specified State statutes, the town] had its share of the costs of Boards of Cooperative

Educational Service, Hospitals and Workmen's Compensation, determined by use and application of the State equalization rate * * *

"6. That [under the State Constitution and Local Finance Law, the constitutional and statutory debt limits for the town] and any of its municipalities, school districts, fire districts and/or some of its district corporations, have been computed and determined by use and application of the State equalization rate * * *

"8. The assessment of any special franchises within THE TOWN OF HAVERSTRAW has been governed, computed and determined by use and application of the State equalization rate applicable to [the year in issue] pursuant to Real Property Tax Law sec. 606".

Further, petitioners placed into evidence SBEA certificates of the State equalization rates for the years 1974 through 1977 and SBEA backup materials for those years. Only the tentative 1978 rate was available at the proceedings conducted in March, 1979.

The Town Attorney was called as a witness in an attempt to establish that the town accepted the SBEA rates for the town, and did not protest administratively or seek judicial review with respect to those rates.

In a decision dated January 17, 1980, the trial court, after evaluating petitioners' evidence on the issue of inequality, concluded that "[t]he only proof" before it "on the issue of inequality [was the] State rates * * * for the years 1974 through 1977" (102 Misc 2d 923, 927). Only the State rates withstood the court's analysis, and these were held to be insufficient to establish inequality. The court rejected the other evidence produced, *inter alia*, because of its alleged inadequate probative value.

In that decision, the trial court further noted that after both sides presented all of their evidence at the March, 1979 trial and rested, chapters 126 and 127 of the Laws of 1979 were enacted and became effective May 22, 1979. Those statutes purportedly affected the right to use the State equalization rates to prove inequality.

The trial court concluded that those statutes were unconstitutional "but even were they to be found otherwise,

they would not be applicable to the steps already taken in the prosecution of these consolidated proceedings" (102 Misc 2d, at p 932). The court reiterated, however (pp 932-933), that "[b]y virtue of the petitioners' failure to prove ratio and inequality, the court must dismiss the petitions [for 1974 through 1978] and it is not necessary for the court to consider the testimony on valuation, since without having established the correct ratio for each of the years under review, there is no way for the court to determine the correct assessments."

On May 5, 1980, before judgment was entered dismissing the petitions for the years 1974 through 1978, the court, on a motion by petitioners for reconsideration, granted reconsideration to the extent of permitting petitioners to reopen their case with respect to the 1978 proceedings. A judgment dated June 26, 1980 was then entered dismissing the petitions for the years 1974 through 1977 and petitioners and the town cross-appealed therefrom.

At the reopened trial pertaining to the 1978 proceedings, petitioners again sought to establish ratio between fair market value and assessed value for the 1978 assessment year by relying upon the State equalization rate. In an effort to comply with the *Guth Realty v Gingold* (34 NY2d 440, 450, 451, *supra*) mandate that "[t]he party who seeks to use the rate will be put to his proof that such use is justified in that case" and to meet any claims by the town that "the equalization ratio is inappropriate to the taxing unit [here, the town], to the category of property involved [here, condominiums] and to the particular property [here, the subject Town 'n Country Condominium units] or any other valid reason which would affect its relevancy or weight", petitioners introduced into evidence certifications of the State rate from the SBEA together with the backup work sheets for the 1978 survey prepared by the SBEA and a certified copy of the "Statistical and Appraisal Procedures of the State Board of Equalization and Assessment in Establishing the State Equalization Rate for the Assessment Roll of the Town of Haverstraw Finally Completed and Filed in 1978". Petitioners also called Samuel Stein as an expert witness. Stein testified at length on direct examination as to the methodology of the SBEA and concluded

that the State rate was statistically reliable and appropriate to both the Town of Haverstraw and the subject property. In fact, Samuel Stein gave the same type of testimony presented by him in *Guth* (*supra*), described in the Court of Appeals decision as follows: "The party who seeks to use the rate will be put to his proof that such use is justified in that case. So, in the instant case, petitioner produced Samuel J. Stein, Director of Research and Statistics for the State Board of Equalization and Assessment as a witness. He interpreted the computer printouts showing data making up the rate formulation, explained how it was collected and showed that it pertained specifically to the taxing unit in issue" (*Guth Realty v Gingold, supra,* p 450).

On cross-examination, the town sought to adduce evidence from Stein that the State rate was inappropriate under the earlier noted "inappropriateness" proviso of *Guth* (*supra,* p 451). The town also called its assessor, Franklin Stein, as a witness. Franklin Stein testified that two thirds of the acreage in the town is owned by the State of New York.

After emphasizing certain aspects of Samuel Stein's cross-examination, the trial court held:

"Upon review of Mr. [Samuel] Stein's testimony, particularly his cross-examination as recited above, the Court concludes that the petitioner has not established that use of the state equalization ratio for the 1978 assessment is justified in this case as to this property, but rather finds that the application of the ratio would be inappropriate under the facts herein. It is inconceivable that the State Board would include in its 1976 survey as one of its samples a garage assessed at only $450 as one of the four apartments out of the 799 apartments listed on the survey, particularly after objection was made by the municipality involved to the inclusion of a garage as an apartment sampling. Furthermore, Mr. Stein did not establish that there were any condominiums included as samples. At best, his testimony only established that one condominium might have been included and it is not clear whether he meant one condominium unit or one condominium complex. Assessments of condominiums are regulated by Section 339-y of the Real Property Law which states in part

that: '(1) * * * In no event shall the aggregate of the assessment of the units plus their common interests exceed the total valuation of the property were the property assessed as a parcel * * *'

"This has been interpreted by the Appellate Division, Second Department, as requiring assessments of condominium units to be on the same basis as that of units in a co-operative corporation. *Matter of Marks v. Pelcher,* 58 AD2d 812. The same Appellate Division, Second Department, in *Matter of River House, Bronxville, Inc. v. Hoffman,* 101 Misc. 2d 422, reversed on other grounds, [79] AD2d [990], has now affirmed the use of a market data approach to valuing a co-operative apartment building which will undoubtedly result in findings of increased value and higher assessments on co-ops and, by virtue of the *Marks v. Pelcher* decision, condominiums, should the market data approach be employed in proving value thereof. This emphasizes the importance of the inclusion of co-op and condominium units as part of the samples in the surveys of the State Board.

"Accordingly, for the reasons setforth [*sic*] herein, the Court finds that the petitioner has failed to prove inequality for the 1978 assessment year and the petition is dismissed."

On their appeal, petitioners argue, *inter alia,* that they proved ratio for the subject years 1974 through 1978. We agree. For the years 1974 through 1977, petitioners' evidence of the SBEA certificates of the State equalization rates, the SBEA backup materials for those years, the testimony of the town's appraiser that the use of these rates was "appropriate", and, to a lesser degree, the testimony of the Town Attorney, all combined to establish petitioners' prima facie case that use of the subject State rates was justified (*Guth Realty v Gingold, supra*). For 1978, petitioners' evidence, which included certifications of the State rate from the SBEA, backup worksheets prepared by the SBEA for 1978, the certified copy of the statistical and appraisal procedures for the assessment roll completed in 1978 for the Town of Haverstraw prepared by the SBEA, and Samuel Stein's extensive testimony served to establish that the use of the subject equalization rate for

1978 was justified. Although mere naked evidence of what the rate was would have been insufficient to justify use of the State rates (*Dinger v Tax Comm.*, 83 AD2d 548), even if buttressed by some insufficient evidence as to the methodology of the SBEA (*Matter of Brigham Park Coop. Apts. v Finance Administrator of City of N. Y.*, 83 AD2d 551, mod 90 AD2d 490), at bar, petitioners' documentary evidence was supported by the testimony of the town's appraiser, the Town Attorney, and Samuel Stein. The evidence adduced was sufficient to justify the use of the State rates; the necessity for justification of the use of the State rates did not require petitioners to present oral expert statistical testimony and entirely replay the evidence of the validity of the use of the State rate methodology that was examined in *Guth* (*supra*) (*860 Executive Towers v Board of Assessors*, 53 AD2d 463, affd *sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors*, 43 NY2d 769).

The burden to show inappropriateness was on the town, which completely failed to meet that burden at the trials in issue. With regard to the years 1974 through 1977, the town in no way provided any affirmative proof to show that use of the subject rates would be inappropriate. With regard to the 1978 rate, petitioners adduced the evidence previously discussed, including the testimony of Samuel Stein. Although the town sought to adduce, through cross-examination, evidence of inappropriateness, and did in fact adduce evidence outlined by the trial court in its decision (i.e., that the SBEA survey included a minimal number of apartments, and no condominiums), the general import of Stein's testimony was that these matters (elicited by the Town Attorney on cross-examination) made no difference with respect to the reliability of the State rate in the case at bar. Further, the town presented no statistical expert to contradict Samuel Stein's testimony. We also note that, although the trial court placed special emphasis on the fact that the subject property involved condominiums and as such might be subject to higher valuation by a market data approach to appraisal, citing *Matter of River House-Bronxville v Hoffman* (101 Misc 2d 422, revd on other grounds *sub nom. Matter of River House-Bronxville v Gallaway*, 79

AD2d 990), our *River House* decision (79 AD2d 990, *supra*), and market data approach in valuing cooperatives were the subject of later enacted legislation specifically designed to reverse our holdings in *River House* and *Matter of 200 Country Club Assoc. v Board of Assessors* (83 AD2d 637; see L 1981, ch 1057, § 4, eff Dec. 3, 1981, enacting Real Property Tax Law, § 581). Thus, the fact that the subject proceedings involve condominium units loses the great significance placed upon it by the town and the trial court (see *Matter of River House-Bronxville v Gallaway,* 100 AD2d 970).

An an independent ground for our determination with regard to the years 1974 through 1977, we are of the opinion that the town's responses to petitioners' notices pursuant to section 716 of the Real Property Tax Law to admit ratio were insufficient and created no issue as to ratio. A failure to deny the ratios set forth in those notices must be deemed an admission of ratios set forth therein (see *Matter of Lawrence Investing Co. v Board of Review,* 86 Misc 2d 642). A failure to "specifically" deny the ratio set forth in a proper notice pursuant to section 716 is equivalent to a failure to make any denial of that ratio and is equivalent to a *Guth* stipulation excusing the need to justify the use of the State equalization rates used in section 716 notices. The town's denial was of no consequence because it claimed a totally unwarranted ignorance and confusion with regard to the notices to admit. Thus, in stating in its responses "that it does not understand the language set forth in said Demand or comprehend its meaning or intent, or is not required to speculate on the intent of the petitioner [*sic*] herein setting forth said Demand and must therefore respectfully deny said Demand", the town ignored the definition of ratio implicit in such cases as *Matter of Wolf v Assessors of Town of Hanover* (308 NY 416) and *860 Executive Towers v Board of Assessors* (53 AD2d 463, 466, affd *sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors,* 43 NY2d 769, *supra*). In *Wolf* (*supra,* p 422), for example, the court stated:

"More precisely, petitioner, to become entitled to relief, must show that the inequality of which he complains would subject him to the payment of more than his just

proportion of the aggregate tax. That is the rationale underlying our decision in *People ex rel. Warren* v. *Carter* (*supra*, 109 N.Y. 576), and that is the reason why proof of inequality may be established only by showing that the assessment has been made, to quote the applicable provision of statute, 'at a higher proportionate valuation than the assessment of other property on the same roll by the same officer' (Tax Law, § 290-c).

"Although, theoretically, this could be shown only by establishing that the subject property is assessed at a greater proportion of its full value than are all the other properties in the tax district, the efforts of the legislature have been directed to shortening the trials in inequality cases, and, accordingly, a procedure for making a selection of test parcels has been prescribed".

Accordingly, by virtue of the operation of section 716 of the Real Property Tax Law, the ratio was established for the years 1974 through 1977. We note that in *Matter of Putnam Theat. Corp. v Gingold* (11 AD2d 1090) the Fourth Department held that on an offensive motion to vacate a response to a section 716 notice to admit ratio, Special Term should not have held that the response should be deemed an admission, but should instead have stricken the response with leave to file a proper one. At bar, however, we would note that the town could have defensively moved to strike or modify the section 716 notices which it allegedly had difficulty understanding. On the facts of this case, the town must be deemed to have opted to risk an adverse determination based on the adequacy of its response. It could not impose upon the petitioning taxpayers the great expense of a ratio trial by interposing an answer that clearly did not comply with, and which actually seeks to avoid the impact of section 716.

Turning to the question of whether petitioners' proof of inequality was barred by a statutory prohibition against the use of the State equalization rates, we note that when the 1979 legislation affecting the right to use the State equalization rates to prove inequality took effect on May 22, 1979 (L 1979, chs 126, 127), no judgment, partial or otherwise, had been obtained on the ratio issue (see *Matter of River House-Bronxville v Gallaway,* 100 AD2d 970,

*supra; Matter of Canigiani v Board of Assessors,* 98 AD2d 233). Of crucial significance, however, are (1) on October 30, 1981, the May 22, 1979 amendment to subdivision 3 of section 720 of the Real Property Tax Law expired (see L 1981, ch 259, § 7; *Matter of Canigiani v Board of Assessors, supra*), and (2) pursuant to the new subdivision 3 of section 720 of the Real Property Tax Law, effective December 3, 1981 (L 1981, ch 1057, § 7), the State equalization rates may be used "(b) in all assessing units other than special assessing units as defined in section eighteen hundred one of this chapter". A special assessing unit is defined in subdivision (a) of section 1801 of the Real Property Tax Law as an assessing unit with a population of 1,000,000 or more. The Town of Haverstraw's population does not render it a special assessing unit (see Legis Manual, 1982-1983, p 989; *Matter of Colt Inds. v Finance Administrator of City of N. Y.,* 54 NY2d 533, 543; *Matter of Avery Ave. Assoc. v Tax Comm.,* 103 AD2d 742). Under these special circumstances, petitioners must be deemed to have established ratio for the years 1974 through 1978, and are entitled to a determination by the trial court on the issue of fair market value of the subject property (see *Matter of J. A. Green Constr. Corp. v Finance Administrator of City of N. Y.,* 56 NY2d 369; *Matter of Canigiani v Board of Assessors, supra; Matter of Slewett & Farber v Board of Assessors,* 54 NY2d 547; *Matter of Colt Inds. v Finance Administrator of City of N. Y.,* 54 NY2d 533, *supra*).

Addressing the substantive arguments raised by the town on its cross appeal (see *Parochial Bus Systems v Board of Educ.,* 60 NY2d 539), we find no merit to those contentions.

Accordingly, the judgments appealed from should be reversed, and the case remitted to Special Term to make findings on fair market value, to apply the ratios established, to render a new determination thereon, and to enter an appropriate judgment.

LAZER, J. P., WEINSTEIN and NIEHOFF, JJ., concur.

Cross appeal dismissed (see *Parochial Bus Systems v Board of Educ.,* 60 NY2d 539).

Judgments dated June 26, 1980 and July 6, 1981 reversed, on the law and the facts, and proceedings remitted to Special Term for a new determination on the evidence heretofore presented, in accordance with the opinion herewith.

Petitioners are awarded one bill of costs.